IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

MARCH-WESTIN COMPANY, INC.,

        **Plaintiff,**

v.                    **//   CIVIL ACTION NO. 1:17CV199**
                                 **(Judge Keeley)**

SWINERTON BUILDERS, INC.,

        **Defendant.**

### MEMORANDUM OPINION AND ORDER GRANTING
### DEFENDANT'S MOTION TO DISMISS [DKT. NO. 6]

Pending is the defendant's motion to dismiss this case for lack of personal and subject matter jurisdiction. For the reasons that follow, the Court **GRANTS** the motion (Dkt. No. 6).

### I. BACKGROUND

The facts alleged in the complaint are as follows.[1] The plaintiff, March-Westin Company, Inc. ("March-Westin"), "is a full-service engineering, general contracting and design-building enterprise headquartered in Morgantown, West Virginia" (Dkt. No. 1 at 2). The defendant, Swinerton Builders, Inc. ("Swinerton"), is a California corporation that offers "general contracting services, including, without limitation, project management and supervision services and subcontractor administration." Id. at 1-2.

---

[1] As discussed below, because the motion to dismiss implicates personal and subject matter jurisdiction, the facts need not be construed in the light most favorable to the plaintiff. Cf. De'Lonta v. Johnson, 708 F.3d 520, 524 (4th Cir. 2013)

## MEMORANDUM OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION TO DISMISS [DKT. NO. 6]

In June 2016, Viega LLC retained Swinerton to manage the construction of two buildings in Broomfield, Colorado ("the Project"). When Swinerton sought bids from subcontractors in January 2017, LignaTerra Global, LLC ("LignaTerra"), submitted a preliminary bid to provide "cross-laminated" and "glue-laminated" timber, which are uncommon building materials in the United States. Id. at 2-3. March-Westin "originally corresponded with LignaTerra . . . to assist it in its methodology in developing its bid," but LignaTerra subsequently determined that it would not be able "to meet prequalification requirements to be a subcontractor on the project." Id. at 3. In April 2017, Swinerton asked March-Westin to provide its own bid for the timber products, with LignaTerra acting as March-Westin's vendor. Id.

As early as April 24, 2017, Swinerton began communicating with March-Westin and its principal, Phillip Weser ("Weser"), and continued to do so over the course of the following two months. In reliance on Swinerton's requests for a bid, requests for performance and payment bonds, and transmission of draft contracts, March-Westin prepared a bid, which it eventually submitted to Swinerton on June 26, 2017. Id. at 3-4.

After March-Westin submitted its bid, Swinerton transmitted drafts of a Master Service Agreement ("MSA"), which Weser executed

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANT'S MOTION TO DISMISS [DKT. NO. 6]**

on behalf of March-Westin on July 7, 2017.[2] After Weser executed
the MSA, Swinerton transmitted draft work orders, including one on
July 21, 2017. In reliance on Swinerton's correspondence, March-
Westin "paid $137,000 to LignaTerra to cover certain project costs
including a payment to Hess Timber Limitless (a German timber
supplier) in order to guarantee [Swinerton's] construction
schedule." Id. at 4. Thereafter, March-Westin incurred internal
costs related to the Project. Id. at 4-5.

    Despite having March-Westin's bid in its possession, Swinerton
transmitted draft work orders containing incorrect prices. Upon
inquiry, Swinerton repeatedly stated that these errors were
clerical and would be corrected. Nevertheless, because revised
drafts consistently contained the inaccurate price, March-Westin
never executed them. Id. at 5. March-Westin alleges that
Swinerton's communications were designed to induce it to believe
that a contract existed and to continue to devote time and effort
to the Project. On August 14, 2017, Swinerton sent March-Westin a
"Notice of Intent to Not Award," which advised that the work order
and MSA "should be considered rescinded." Id. Since that time,

_____

    [2] March-Westin affirmatively alleges that Swinerton never
executed the MSA, and thus that any alternative dispute or venue
provisions are inapplicable (Dkt. No. 1 at 4).

3

**MEMORANDUM OPINION AND ORDER GRANTING**
**DEFENDANT'S MOTION TO DISMISS [DKT. NO. 6]**

Swinerton has worked "directly with the timber supplier procured by LignaTerra and [March-Westin]," and "has made use of and benefitted from the cost estimates, designs and techniques introduced to the project by [March-Westin]." Id. at 5-6.

In its complaint filed on November 21, 2017, March-Westin claims relief for 1) Fraudulent or Negligent Inducement, 2) Breach of Contract, 3) Unjust Enrichment, 4) Promissory Estoppel, and 5) Conversion. Id. at 6-9. Swinerton was served through the Secretary of State on December 6, 2017 (Dkt. No. 3). After the parties stipulated to an extension of time for it to do so, Swinerton moved to dismiss the complaint on January 15, 2018 (Dkt. Nos. 5; 6). The Court heard argument on the motion at a scheduling conference on February 22, 2018.

## II. DISCUSSION

### A.    Personal Jurisdiction

Swinerton argues that March-Westin's complaint should be dismissed for lack of personal jurisdiction (Dkt. No. 7 at 14-17). "Under Rule 12(b)(2), a defendant must affirmatively raise a personal jurisdiction challenge, but the plaintiff bears the burden of demonstrating personal jurisdiction at every stage following such a challenge." Grayson v. Anderson, 816 F.3d 262, 267 (4th Cir.

**MEMORANDUM OPINION AND ORDER GRANTING**
**DEFENDANT'S MOTION TO DISMISS [DKT. NO. 6]**

2016). "[W]hen . . . the court addresses the question on the basis
only of motion papers, supporting legal memoranda and the relevant
allegations of a complaint, the burden on the plaintiff is simply
to make a prima facie showing of a sufficient jurisdictional basis
to survive the jurisdictional challenge." Combs v. Bakker, 886 F.2d
673, 676 (4th Cir. 1989).

"Ultimately, however, a plaintiff must establish facts
supporting jurisdiction over the defendant by a preponderance of
the evidence," and the Court should "follow a procedure that allows
it to dispose of the [issue] as a preliminary matter." Grayson, 816
F.3d at 268. "[I]f a court requires the plaintiff to establish
facts supporting personal jurisdiction by a preponderance of the
evidence prior to trial," it must "afford the parties a fair
opportunity to present both the relevant jurisdictional evidence
and their legal arguments." Id.

In this case, both Swinerton and March-Westin have presented
evidence outside the pleadings in the course of briefing the motion
to dismiss. As well, the Court has heard oral argument on the
motion, and, after fair consideration of the arguments of the
parties, concludes that the parties have had "a fair opportunity to
present both the relevant jurisdictional evidence and their legal

## MEMORANDUM OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION TO DISMISS [DKT. NO. 6]

arguments." <u>Grayson</u>, 816 F.3d at 268. In light of the evidence, the Court further concludes that March-Westin has failed to establish the existence of this Court's personal jurisdiction over Swinerton under either a prima facie or preponderance of the evidence standard.

### 1.    Standard of Review

"A federal district court may only exercise personal jurisdiction over a foreign corporation if such jurisdiction is authorized by the long-arm statute of the state in which it sits and application of the long-arm statute is consistent with the due process clause of the Fourteenth Amendment." <u>Consulting Eng'rs Corp. v. Geometric Ltd.</u>, 561 F.3d 273, 277 (4th Cir. 2009). "[B]ecause the West Virginia long-arm statute is coextensive with the Due Process Clause, it is unnecessary . . . to go through the normal two-step formula for determining the existence of personal jurisdiction. Rather, the statutory inquiry necessarily merges with the Constitutional inquiry." <u>Shelton v. Crookshank</u>, No. 3:17-CV-108, 2018 WL 527423, at *3 (N.D.W.Va. Jan. 24, 2018) (quoting <u>In re Celotex Corp.</u>, 124 F.3d 619, 627-28 (4th Cir. 1997)).

> To satisfy the constitutional due process requirement, a defendant must have sufficient "minimum contacts" with the forum state such that "the maintenance of the suit does not offend traditional notions of fair play and

## MEMORANDUM OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION TO DISMISS [DKT. NO. 6]

substantial justice." The minimum contacts test requires the plaintiff to show that the defendant "purposefully directed his activities at the residents of the forum" and that the plaintiff's cause of action "arise[s] out of" those activities. This test is designed to ensure that the defendant is not "haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." It protects a defendant from having to defend himself in a forum where he should not have anticipated being sued. Because a sovereign's jurisdiction remains territorial, to justify the exercise of personal jurisdiction over a non-resident defendant, the defendant's contacts with the forum state must have been so substantial that "they amount to a surrogate for presence . . . ."

Geometric, 561 F.3d at 277-78 (internal citation omitted).

The Fourth Circuit "has synthesized the due process requirements for asserting specific personal jurisdiction in a three part test in which 'we consider (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable.'" Id. at 278 (quoting ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002)).[3] Under the first prong, in the business context, courts

_____

[3] March-Westin does not contest that Swinerton lacks the "continuous and systemic" contacts that would subject it to general jurisdiction in West Virginia (Dkt. No. 9 at 5 n.1). CFA Inst. v. Inst. of Chartered Fin. Analysts of India, 551 F.3d 285, 292 n.15

**MEMORANDUM OPINION AND ORDER GRANTING**
**DEFENDANT'S MOTION TO DISMISS [DKT. NO. 6]**

consider various nonexclusive factors, including "whether the defendant maintains offices or agents in the forum state," "whether the defendant owns property in the forum state," "whether the defendant reached into the forum state to solicit or initiate business," "whether the defendant deliberately engaged in significant or long-term business activities in the forum state," "whether the parties contractually agreed that the law of the forum state would govern disputes," "whether the defendant made in-person contact with the resident of the forum state in the forum state regarding the business relationship," "the nature, quality and extent of the parties' communications about the business being transacted," and "whether performance of the contractual duties was to occur within the forum." Id. (internal citations omitted). Only if the first prong is satisfied does the Court analyze the second and third prongs. Id.

### 2. Discussion

The threshold inquiry in this case is whether Swinerton meets "the minimum contacts requirement of constitutional due process

_____

(4th Cir. 2009). Although Swinerton is registered to do business in West Virginia, it is not a licensed contractor and does not perform any work there. Moreover, Swinerton does not maintain an office in West Virginia and does not direct business activities toward the state (Dkt. No. 6-1 at 1-2).

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANT'S MOTION TO DISMISS [DKT. NO. 6]**

that [it] purposefully availed [itself] of the privilege of conducting business under the law of the forum state." <u>Geometric</u>, 561 F.3d at 278. Swinerton contends that it lacks sufficient contacts with West Virginia (Dkt. Nos. 7 at 17; 10 at 8-10), while March-Westin contends that Swinerton's contacts were much more than "random, fortuitous, or attenuated" (Dkt. No. 9 at 6). Because the Court's analysis is fact-intensive, it is instructive to survey how other courts have considered similar matters.

In <u>Burger King Corp. v. Rudzewicz</u>, the Supreme Court found that Florida could exercise personal jurisdiction over a Michigan franchisee whose dispute with the franchiser "grew directly out of 'a contract which had a <u>substantial</u> connection with [Florida],'" despite the fact that he had no physical ties with the state. 471 U.S. 462, 479 (1985) (quoting <u>McGee v. Int'l Life Ins., Co.</u>, 355 U.S. 220, 223 (1957) (emphasis added)). The defendant had deliberately reached out to a "Florida corporation for the purchase of a long-term franchise." <u>Id.</u> at 480. In doing so, he "entered into a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida," including contractual provisions that selected the law of Florida to govern any disputes. <u>Id.</u> at 480-81. In other words, he voluntarily accepted "long-term and exacting regulation of his

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANT'S MOTION TO DISMISS [DKT. NO. 6]**

business from Burger King's Miami headquarters." Id. at 480.
Moreover, by breaching the franchise agreement, the defendant had
caused foreseeable injury in Florida. The "quality and nature" of
his relationship with Florida was thus much more than random,
fortuitous, or attenuated. Id.

In Consulting Engineers Corp. v. Geometric Ltd., Consulting
Engineers Corp. ("CEC"), a Virginia corporation, had a business
relationship with Structure Works, LLC ("Structure Works") and
Geometric Software Solutions ("Geometric"), Colorado and Indian
corporations respectively. 561 F.3d 273, 275 (4th Cir. 2009).
Structure Works retained Geometric to work on a design project, and
introduced Geometric to CEC, which it believed might be able to
assist with an aspect of the project. Thereafter, following several
emails and phone calls, CEC entered into non-disclosure agreements
with both Geometric and Structure Works. Id. at 275-76. During the
four subsequent months of negotiation regarding CEC's potential
assistance, the three companies met once in India. Geometric then
hired a CEC employee to work for it in India. Structure Works
ultimately elected not to pursue the project with CEC. Id. at 276.

When CEC filed suit in Virginia, Structure Works and Geometric
contested personal jurisdiction. In concluding that Structure Works
could not be sued in Virginia, the Fourth Circuit expressly

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANT'S MOTION TO DISMISS [DKT. NO. 6]**

discounted the fact that the company had reached out to CEC and

directed eight emails into Virginia:

> Structure Works did not have offices or employees in
> Virginia, nor did it own property there. It had no
> on-going business activity in Virginia. The record does
> not reflect any in-person contact with CEC in Virginia.
> Structure Works negotiated NDA II from, and signed it in,
> Colorado, and the agreement includes a Colorado
> choice-of-law and choice-of-forum clause. Any work
> contemplated by the discussions would have been performed
> in India; no formal agreement was ever reached to perform
> the work; and, indeed, the very activity of which CEC
> complains—the hiring of Kumar—took place in India.
> Further, because the alleged conspiracy (between two
> non-Virginia corporations) and alleged tortious
> interference with an at-will contract occurred in India,
> Indian law would govern under Virginia's choice of law
> provisions.

Id. at 279-80.

Likewise, despite the fact that Geometric had exchanged

communications with CEC and agreed that Virginia law would govern

their non-disclosure agreement, the Fourth Circuit concluded it

could not be haled into a court in Virginia:

> Geometric is based in, and negotiated solely from, India.
> Geometric owns no property in Virginia. None of
> Geometric's employees work in Virginia; none have ever
> even traveled to Virginia. Although CEC contended that
> Geometric "initiated" contact with it in Virginia, the
> record does not support this assertion. The record
> reflects, and indeed CEC does not dispute, that the two
> parties were first introduced on a joint conference call
> with Structure Works.
>
> Geometric engaged in no on-going business activities in
> Virginia, and the only in-person meeting among the

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANT'S MOTION TO DISMISS [DKT. NO. 6]**

> parties occurred in India. If the parties had consummated
> their agreement to work together, the work would have
> been performed in India. Again, the activity of which CEC
> complains—the hiring of Kumar in alleged violation of NDA
> I—took place in India. The alleged conspiracy and
> interference with an at-will contract occurred outside of
> Virginia, involving an alleged plan between two
> non-Virginia corporations to hire an employee working in
> India.

Id. at 281-82.

In Perdue Foods LLC v. BRF S.A., Perdue Holdings, Inc. ("Perdue") and BRF S.A. ("BRF"), a Brazilian company, executed an agreement in 2002 to avoid confusion between Perdue's PERDUE mark and BRF's PERDIX mark. 814 F.3d 185, 187-88 (4th Cir. 2016). Perdue agreed not to register its mark in Brazil, while BRF agreed to abandon a version of its mark worldwide. The agreement contained a Maryland choice-of-law provision. Id. at 188. Thereafter, "[f]rom 2012 to 2014, Perdue bought an aggregate 715,000 pounds of chicken . . . from BRF. Perdue sent purchase orders from Maryland and BRF sent invoices to Maryland . . . but at Perdue's direction BRF shipped the chicken from Brazil to Tanzania." Id.

When BRF subsequently sought to register its mark in several foreign countries, Perdue sued it in Maryland. Id. The Fourth Circuit, however, concluded that BRF had not purposefully availed itself of the privilege of doing business in Maryland.

12

**MEMORANDUM OPINION AND ORDER GRANTING**
**DEFENDANT'S MOTION TO DISMISS [DKT. NO. 6]**

> The company employs no Maryland officers or agents and owns no property in the state. BRF did not initiate the negotiations that led to the Agreement, and no BRF employee traveled to Maryland in connection with the Agreement. BRF conducts no business in Maryland: it does not import any products into or sell or ship products to any clients in Maryland, and it has no contract with any entity in Maryland other than Perdue. BRF's alleged breach of the Agreement occurred not in Maryland, but in the Foreign Countries.

Id. at 189. Moreover, the agreement itself did not require BRF or Perdue to perform any duties in Maryland or create continuing obligations or contacts in the state. Id. at 190. In light of these factors, the court concluded that Maryland lacked personal jurisdiction over BRF. Id. at 192.

Here, Swinerton's contacts with West Virginia are akin to those of the defendants in Geometric and Perdue. Although Swinerton maintains a registered agent in West Virginia, it "is not a license[d] contractor in West Virginia and does not perform any work there," "has no offices or other facilities in West Virginia," and "does not direct business activities toward West Virginians or otherwise advertise in West Virginia" (Dkt. No. 6-1 at 1-2). Indeed, Swinerton did not initiate contact with March-Westin, but was placed in contact with the company through LignaTerra, another potential subcontractor (Dkt. Nos. 6-3; 6-4). There also is no

indication that Swinerton owns any property in West Virginia. <u>Geometric</u>, 561 F.3d at 278.

Swinerton did not engage in "significant or long-term business activities" in West Virginia. <u>Id.</u> The four-month relationship between Swinerton and March-Westin resulted only in the execution of an MSA that did not obligate either party to conduct work or enter into future agreements, much less conduct any work in West Virginia (Dkt. No. 6-2). The subject of the parties' specific negotiations was a project situated in Colorado for which March-Westin would facilitate the provision of specialized building materials from outside the United States. Although March-Westin undoubtedly is located in West Virginia, even a project-specific agreement would not have required it to conduct any work there. March-Westin does not dispute that Swinerton never made "in-person contact with [it] in the forum state." <u>Geometric</u>, 561 F.3d at 278. Indeed, Weser traveled to Colorado to discuss the Project (Dkt. No. 9-2 at 7, 74). And in the MSA, the parties agreed that the law of Colorado would govern any disputes, and that Colorado would be the appropriate venue (Dkt. No. 6-2 at 15).

March-Weston rests its argument primarily on the contention that the nature, quality, and extent of the parties' communications establish that Swinerton purposefully availed itself of conducting

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANT'S MOTION TO DISMISS [DKT. NO. 6]**

business in West Virginia (Dkt. No. 9 at 5-6). Although the parties' communications between April and August 2017 are at times quite detailed, "even very extensive communications are not dispositive of the defendant's purposeful availment, unless the parties had an extensive, substantive, or continuing relationship that tied their behavior to the forum state." <u>Alacrity Renovation Servs., LLC v. Long</u>, No. 3:16-cv-00206-FDW-DSC, 2016 WL 4150011, at *7 (W.D.N.C. Aug. 3, 2016). Here, the emails provided by March-Westin are insufficient to establish such a tie to West Virginia. Put simply, the parties' communications are exactly what one might expect between sophisticated parties negotiating a relatively significant construction contract.

As early as September 2016, LignaTerra communicated with Swinerton about supplying and erecting wood aspects of the Project, indicating that it would use March-Westin as "a strategic partner" if selected (Dkt. No. 6-4). On April 25, 2017, Weser and LignaTerra representatives visited Colorado to attend a meeting regarding the Project (Dkt. No. 9-2 at 73-73). Throughout April and May 2017, representatives from Swinerton, LignaTerra, and March-Westin exchanged emails concerning drawings, wood treatments, and pricing. <u>Id.</u> at 64, 70, 72. At the same time, Swinerton and March-Westin

exchanged communications regarding March-Westin's forthcoming bid to provide "the bulk of the structure." <u>Id.</u> at 55, 60.

Thereafter, the parties' communications became more significant. In early June, Swinerton indicated that it "was hoping to obtain a bond commitment [l]etter" and execute a general contract, the MSA, so that March-Westin could execute a project-specific contract once Swinerton executed its contract with Viega. <u>Id.</u> at 49, 51. From June 1 through 16, 2017, March-Westin continued to provide pricing estimates, as well as a bonding letter, for Swinerton to utilize in its negotiations with Viega. <u>Id.</u> at 42-50. Once Swinerton was "officially under contract with Viega" on June 27, 2017, it again expressed a desire to execute a contract with March-Westin. <u>Id.</u> at 40-41. Swinerton also asked March-Westin to provide "updated pricing" and explain "why [they] did not realize [certain] design efficiency savings." <u>Id.</u> at 34-38.

While March-Weston was working toward a "100% bid" in early July 2017, the parties executed the MSA, and Swinerton began "working on the project specific work orders." <u>Id.</u> at 28. During late July and early August, concerns began to arise regarding suppliers' ability to meet Swinerton's schedule, and the parties disagreed about the overall price of March-Westin's services. <u>Id.</u> at 8-22. Ultimately, on August 14, 2017, Swinerton forwarded Weser

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANT'S MOTION TO DISMISS [DKT. NO. 6]**

a Notice of Intent to Not Award March-Westin a subcontract for the Project. <u>Id.</u> at 1.

While these communications certainly amount to more than random and fortuitous contacts, they are not substantial enough to outweigh the other relevant factors. Indeed, they reinforce the attenuated nature of Swinerton's contacts with West Virginia, which as discussed, related to a construction project in Colorado and the possibility that March-Westin would execute a subcontract to supply and install specialized timber products from Europe. The parties' in-person contact took place in Colorado. Swinerton sent all its communications to March-Westin from Colorado. In addition, it executed the MSA in Colorado, and the MSA itself selected the law of Colorado to govern any disputes.

Far from purposefully availing itself of the privilege of conducting business in West Virginia, Swinerton attempted to negotiate the provision of materials and services in Colorado, but fell short of a final agreement with a West Virginia company. "Put simply, however significant the plaintiff's contacts with the forum may be, those contacts cannot be decisive in determining whether the defendant's due process rights are violated." <u>Fastpath, Inc. v. Arbela Technologies Corp.</u>, 760 F.3d 816, 823 (8th Cir. 2014) (quoting <u>Walden v. Fiore</u>, 571 U.S. 277 (2014)) (holding that a

**MEMORANDUM OPINION AND ORDER GRANTING**
**DEFENDANT'S MOTION TO DISMISS [DKT. NO. 6]**

company could not be sued in Iowa despite "'aggressively pursuing' a business relationship with an Iowa company").[4]

This case is distinguishable from <u>Tire Engineering & Distribution, LLC v. Shandong Linglong Rubber Co., Ltd.</u>, cited by March-Westin in support of its contrary argument. 682 F.3d 292 (4th Cir. 2012). There, plaintiff Alpha developed and sold specialized tires for underground mining vehicles, the blueprints for which it closely guarded in order to prevent competitors from copying its design. <u>Id.</u> at 298. Defendant Al Dobowi was found subject to personal jurisdiction in the plaintiff's home state of Virginia because it hatched a "conspiracy to unlawfully copy Alpha's tires while in Virginia and substantially correspond[ed] with an employee based in Virginia." <u>Id.</u> at 303. Defendant Linglong was a foreign tire manufacturer that produced the copies despite knowing "that the blueprints had been stolen." It even communicated with Al Dobowi's employee in Virginia to discuss "taking steps to slightly

---

[4] This conclusion also is consistent with a number of district court decisions. <u>See, e.g.</u>, <u>Dehner Co., Inc. v. Appromed Corp.</u>, No. 8:16CV7, 2016 WL 9408573, at *4-*5 (D. Neb. Sept. 14, 2016) (finding that a defendant was not subject to personal jurisdiction despite emails, telephone calls, and the submission of documents); <u>Decusati v. Reiss Eng'g, Inc.</u>, No. 3:15-cv-204-JAG, 2015 WL 4622494, at *3-*4 (E.D. Va. July 30, 2015) (reasoning that a Florida company's negotiations with a prospective employee in Virginia did not establish personal jurisdiction).

modify their tires to make it less obvious they had copied Alpha's design." Id. at 299. The Fourth Circuit found these communications to be "qualitatively significant," and reasoned that Linglong too could expect to be haled into a Virginia court due to its "extensive collaboration" and "substantively weighty communications" regarding unlawful conduct in the forum state. Id. at 305.[5]

Although March-Westin contends that Swinerton engaged in "extensive collaboration" with it, there are no "substantively weighty communications" that warrant haling Swinerton into court in West Virginia. Rather, like Geometric, "the locus of the parties' interaction was overwhelmingly" outside the forum state in Colorado. Tire Engineering, 682 F.3d at 302. Therefore, March-Westin has not met its burden to establish personal jurisdiction over Swinerton in West Virginia.

---

[5] Several other cases cited by March-Westin involve far more significant contacts than are at issue in this case. CFA Institute, 551 F.3d at 294 (finding personal jurisdiction where the defendant visited the plaintiff in Virginia, attended the plaintiff's board meeting in Virginia, and "corresponded and collaborated" with the plaintiff for years); Patriot Coal Sales LLC v. Bridgehouse Commodities Trading Ltd., No. 2:12-cv-03653, 2013 WL 504890, at *4-*6 (S.D.W.Va. Feb. 8, 2013) (finding personal jurisdiction over affiliated companies that, among other things, sent a comfort letter to West Virginia guaranteeing their performance of significant contractual duties in West Virginia).

## MEMORANDUM OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION TO DISMISS [DKT. NO. 6]

**B.    Subject-Matter Jurisdiction**

Alternatively, Swinerton argues that the case should be dismissed for lack of subject-matter jurisdiction due to provisions of the MSA (Dkt. No. 7 at 7-12). March-Westin contends that the MSA does not apply because Swinerton repudiated it (Dkt. No. 9 at 2-3). Should the Court need to reach this issue, it is clear that March-Westin's argument is without merit, and the Court would lack subject matter jurisdiction.

**1.    Standard of Review**

Pursuant to Fed. R. Civ. P. 12(b)(1), a party may move to dismiss an action for lack of subject matter jurisdiction. "A defendant may contest subject matter jurisdiction in one of two ways: by attacking the veracity of the allegations contained in the complaint or by contending that, even assuming the allegations are true, the complaint fails to set forth facts upon which jurisdiction is proper." <u>Durden v. United States</u>, 736 F.3d 296, 300 (4th Cir. 2013) (citing <u>Kerns v. United States</u>, 585 F.3d 187, 192 (4th Cir. 2009)). "If the defendant challenges the factual predicate of subject matter jurisdiction, '[a] trial court may then go beyond the allegations of the complaint <u>and in an evidentiary hearing</u> determine if there are facts to support the jurisdictional

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANT'S MOTION TO DISMISS [DKT. NO. 6]**

allegations' . . . ." <u>Kerns</u>, 585 F.3d at 192 (alteration and emphasis in original). In this case, Swinerton challenged the factual predicate of subject matter jurisdiction in its motion to dismiss, and both parties presented relevant evidence during briefing. When the Court took up the motion, neither party presented additional evidence.

    **2.  Discussion**

In its complaint, March-Westin alleged that the MSA "was never executed by Defendant" and that its provisions thus do not apply (Dkt. No. 1 at 4). Swinerton, however, submitted the executed MSA with its motion to dismiss (Dkt. No. 6-2). The MSA bears the electronic signature of both Phillip Weser of March-Westin and Chris Staker of Swinerton. <u>Id.</u> at 15. According to the declaration of John Spight, project executive at Swinerton, these signatures were affixed to the MSA on July 7, 2017 (Dkt. No. 6-1 at 2). March-Westin did not present any evidence to rebut Swinerton's contention that it executed the MSA on the same day as Weser.

The MSA requires the parties to mediate and participate in binding arbitration:

> 15. **DISPUTES AND DISPUTE RESOLUTION**. A Dispute shall arise when Contractor denies or otherwise challenges a timely Claim brought by Subcontractor or the Parties have

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANT'S MOTION TO DISMISS [DKT. NO. 6]**

another form of disagreement arising from the Subcontract Documents (collectively "Dispute").

. . .

(d) **Disputes between Contractor and Subcontractor**. If a dispute is only between Contractor and Subcontractor, then the dispute resolution procedure set forth in Paragraphs 15(e) through 15(f) below shall apply. . . .

(e) **Mediation**. Neither Party shall proceed with arbitration or litigation until the parties have mediated the Dispute. Mediation will be conducted under the American Arbitration Association's Construction Industry Mediation Rules unless the Parties agree otherwise. The costs of the mediator shall be shared equally by the Parties. The Parties agree to stay any legal or equitable proceedings pending completion of mediation. The mediation shall be held in the city or county where the Project is located, unless otherwise agreed. Prior to the mediation, Subcontractor shall provide sufficient supporting information as determined by Contractor to enable Contractor to reasonably evaluate Subcontractor's claims. Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction thereof.

(f) **Binding Arbitration**. For Disputes not resolved by mediation as set forth above, the Parties agree to resolve such Disputes by binding arbitration . . . .

(Dkt. No. 6-2 at 11-12).

March-Westin does not contest that the dispute resolution provisions of the MSA require binding arbitration, that the provisions are enforceable, and that the dispute arises out of the contract such that application of the provisions warrants dismissal of this case. See Ohio Power Co. v. Dearborn Mid-West Conveyor Co.,

22

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANT'S MOTION TO DISMISS [DKT. NO. 6]**

Inc., No. 5:11CV164, 2012 WL 2522960, at *2 (N.D.W.Va. June 29, 2012) (analyzing these factors and dismissing a lawsuit). Rather, March-Westin contends that Swinerton repudiated the MSA in its Notice of Intent to Not Award (Dkt. No. 9-1), where Swinerton stated:

> As March-Westin Company, Inc. ("March Westin") has failed to maintain the budgetary number provided by LignaTerra Global, LLC; Swinerton Builders hereby terminates any current work being done by March Westin on the Viega Headquarters' Work Order issued July 21, 2017, and the Subcontract previously forwarded but not yet executed should be considered rescinded.
>
> . . . Swinerton is terminating any and all agreements with March Westin as it relates to this Project.

In West Virginia, the doctrine of anticipatory breach, i.e. repudiation, is defined as follows:

> [T]he renunciation of an executory contract by one party thereto, which would excuse performance by the other, must be unequivocal and deal with the entire performance to which the contract binds the party which it is claimed has renounced the same.

Mollohan v. Black Rock Contracting, Inc., 235 S.E.2d 813, 815-16 (W. Va. 1977).[6]

Here, the plain language of Swinerton's letter does not support March-Westin's argument that Swinerton unequivocally

---

[6] At the scheduling conference, the parties agreed that the Court should apply the contract law of West Virginia, rather than Colorado.

repudiated the MSA. Throughout the parties' negotiations, the terms "work order" and "subcontract" were used interchangeably and separate from the MSA to discuss the parties' prospective, project-specific agreement (Dkt. No. 10-1 at 2). In its notice, Swinerton expressly terminated only work being done on a "work order" and "subcontract" (Dkt. No. 9-1). In contrast, the MSA covered the parties' general relationship, and was not project-specific (Dkt. Nos. 6-2; 10-1 at 1). Swinerton's intent to terminate "any and all agreements with March Westin as it relates to this Project" thus does not implicate the MSA (Dkt. No. 9-1).

Moreover, even if Swinerton did repudiate the MSA, the arbitration clause in the agreement likely would survive, and March-Westin's claims would be subject to binding arbitration. <u>See</u> Syl. Pt. 3, <u>State ex rel. Ranger Fuel Corp. v. Lilly</u>, 267 S.E.2d 435, 437 (W. Va. 1980) ("[T]he duty to arbitrate under an arbitration clause in a contract survives the termination of the contract.").[7]

---

[7] Given its conclusions regarding personal and subject matter jurisdiction, the Court need not reach Swinerton's additional argument that venue is improper in the Northern District of West Virginia (Dkt. No. 7 at 17-20).

**MEMORANDUM OPINION AND ORDER GRANTING**
**DEFENDANT'S MOTION TO DISMISS [DKT. NO. 6]**

### III. CONCLUSION

For the reasons discussed, the Court **GRANTS** Swinerton's motion (Dkt. No. 6), and **DISMISSES** this case **WITHOUT PREJUDICE.**

It is so **ORDERED.**

The Court directs the Clerk to transmit copies of this Order to counsel of record, to enter a separate judgment order, and to strike this case from the Court's active docket.

DATED: June 1, 2018.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE